**WILTSHIRE v. WARBURTON et al. (two cases).**

Nos. 3253, 3264.

Circuit Court of Appeals, Fourth Circuit.

June 13, 1932.

J. H. Rives, Jr., of Richmond, Va., for appellant.

John Randolph Tucker, of Richmond, Va., for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This is an appeal from a decree entered in the District Court of the United States for the Eastern District of Virginia, in the matter of Ernest Boggs, bankrupt, in October, 1931, awarding certain real estate to the appellee, Anna L. Bull. The real estate, a house and lot, is located in the city of Williamsburg, Va. The facts as found by the referee in bankruptcy, and about which there is no dispute, are as follows:

"Prior to August 23, 1924, the Bankrupt Ernest Boggs, was the owner of two adjoining lots of land in the City of Williamsburg, Virginia, described in the deed from his grantor, Blanche E. Moncure, dated November 26, 1923, as follows:

" '1. That certain lot, piece or parcel of land, situated in the City of Williamsburg, State of Virginia, being the Northern portions of lots 6 and 7 of West Williamsburg, which lots were conveyed to the grantor by deed from Mary R. Van Ness, et als., dated May 30, 1917, and recorded in the Clerk's Office of said City in Deed Book No. 8 at page 214, bounded and described as follows: Commencing at a point at the southeastern intersection of Prince George Street and Harris Avenue; thence in an easterly direction the distance of 100 feet, more or less, along the southern boundary line of Prince George Street to a point at the intersection of the dividing line between lots 5 and 6 and the southern boundary line of said Prince George Street; thence along said dividing line in a southerly direction the distance of 50 feet to a point; thence at approximately right angles to said dividing line in a westerly direction the distance of 100 feet, more or less, to the eastern boundary of Harris Avenue; thence along the eastern boundary line of Harris Avenue in a northerly direction the distance of 50 feet to point of beginning; being bounded on the North by Prince George Street; on the East by Lot No. 5, on the South by the remaining portion of lots 6 and 7; and on the west by Harris Avenue; also

" '2. That certain lot, piece or parcel of land, situated in the City of Williamsburg, State of Virginia, being portions of lots 6 and 7, of West Williamsburg, which lots were conveyed to the grantor by deed from Mary R. Van Ness, et als., dated May 30, 1917, and recorded in the Clerk's Office of said County in Deed Book 8 at page 214, and bounded and described as follows: Commencing at a point on the eastern boundary

line of Harris Avenue, 50 feet south of the point of intersection of the southern line of Prince George Street with the eastern line of Harris Avenue; thence in an easterly direction along the southern boundary line of lot hereinabove described, the distance of 100 feet, more or less, to the western boundary line of lot No. 5, of West Williamsburg; thence along the dividing line between lots 5 and 6 in a southerly direction the distance of 50 feet to a point on said line; thence at approximately right angles with said dividing line in a westerly direction the distance of 100 feet, more or less, to the eastern boundary line of Harris Avenue; thence along the eastern boundary line of Harris Avenue the distance of 50 feet to point of beginning, and bounded as follows: On the North by the lot hereinabove described; on the East by lot No. 6; on the South by remaining portions of lots 6 and 7, belonging to the grantor; and on the West by Harris Avenue.'

"This deed was admitted to record November 27, 1923.

"On August 23, 1924, the bankrupt and his wife, Sabra Boggs, executed and delivered to Curtis L. Wood their deed conveying the following described property:

" 'That certain lot, piece or parcel of land situated in the City of Williamsburg, State of Virginia, being portions of Lots 6 and 7, of "West Williamsburg," which lots were conveyed to the grantor by Blanche E. Moncure by her deed dated November 26th, 1923, and recorded in the·Clerk's Office of the said City in Deed Book 10 page 132, and bounded and described as follows: Commencing at a point on the eastern boundary line of Harris Avenue, 50 feet South of the point of intersection with southern line of Prince George Street with the eastern line of Harris Avenue; thence in an easterly direction along the southern boundary line of the lot of·the grantor, the distance of 100 feet, more or less, to the western boundary line of Lot No. 5, of "West Williamsburg"; thence along the dividing line between lots 5 and 6 in a southerly direction the distance of 50 feet to ·a point on said line; thence at approximately right angles with said dividing line in a westerly direction the distance of 100. feet, more or less, to the eastern boundary line of Harris Avenue; thence along the eastern boundary line of Harris Avenue, the distance of 50 feet to point of beginning, and bounded as follows: On the North by the lot of Ernest U. Boggs; on the

East by lot No. 5; on the South by remaining portions of lots 6 and 7, belonging to Blanche E. Moncure; and on the West by Harris Avenue together with all the rights of way, appurtenances and conditions embraced in the deed from Blanche E. Moncure to the grantor above referred to,' the same being the property described as lot 2 in the deed, above, from Blanche E. Moncure to the bankrupt. This deed was admitted to record September 6, 1924.

"On March 12, 1928, the bankrupt and his wife executed and delivered their deed to Geneva Mullen, conveying the following described property:

" 'That certain lot, piece or parcel of land, together with the improvements thereon and the appurtenances thereunto belonging, situated on the east side of Cromwell Street, sometimes known as Harris Avenue, in the City of Williamsburg, Virginia, being a portion of lots 6 and 7 described on a plat of record known as "West Williamsburg," and being the lot, piece or parcel of land described as No. 2, in a certain deed from Blanche E. Moncure, widow, et als., to Ernest U. Boggs dated November 26, 1923 and of record in Williamsburg Deed Book 10 page 132, to which reference is here made, and being bounded and described as follows: Commencing at a point on the eastern boundary of Cromwell Street 50 feet south of the point of intersection of the said line of Prince George Street with the east line of said Cromwell Street; thence in an easterly direction along the southern boundary line of lot now or formerly owned by C. L. Wood, the distance of 100 feet, more or less, to the western boundary line of lot No. 5 as shown on the plat of "West Williamsburg"; thence along the dividing line between lots 5 and 6 shown on the plat of "West Williamsburg," in a southerly direction the distance of 50 feet, to a point on said dividing line; thence at approximately right angles with said line and in a westerly direction the distance of 100 feet, more or less, to the east boundary line of said Cromwell Street; and thence along the east boundary line of Cromwell Street the distance of 50 feet, to the point of beginning, and. bounded on the North by the lot now or formerly owned by C. L. Wood, on the East by Lot No. 5, now or formerly owned by W. A. R. Goodwin, on the south by the remainder of lots 6 and 7, now or formerly owned by the College of William and Mary, and on the west by said Cromwell Street formerly known as Harris

Avenue, together with an easement of right of way 3 feet in width adjacent to and immediately south of the lot hereby conveyed extending from said Cromwell Street to the said lot No. 5 as the same is more fully set forth and described in the said deed from Blanche E. Moncure, widow, hereinbefore referred to,' the same also, being the property described as lot 2 in the deed, above, from Blanche E. Moncure to the bankrupt. This deed was admitted to record March 13, 1928.

"On July 7, 1928, Curtis L. Wood, and Maud D. Wood, his wife, executed and delivered to John G. Warburton their deed conveying the following described property:

"'That certain lot, piece or parcel of land situated in the City of Williamsburg, State of Virginia, being portions of lots 6 and 7 of West Williamsburg, which lots were conveyed to the grantor by Blanche E. Moncure by her deed dated November 26, 1923, and recorded in the Clerk's Office of said City in Deed Book 10 page 132, and bounded and described as follows: Commencing at a point on the east boundary line of Harris Avenue 50 feet south of the point of intersection with the southern line of Prince George Street with the eastern line of Harris Avenue; thence in an easterly direction along the southern boundary line of the lot of grantor, the distance of 100 feet, more or less, to the western boundary line of Lot No. 5 of "West Williamsburg," thence along the dividing line between lots 5 and 6 in a southerly direction the distance of 50 feet to a point on the said line; thence at approximately right angles with the said dividing line in a westerly direction the distance of 100 feet, more or less, to the eastern boundary line of Harris Avenue; thence along the eastern boundary line of Harris Avenue the distance of 50 feet to the point of beginning, and bounded and described as follows: On the North by the lot of Ernest U. Boggs; on the East by Lot No. 5, on the South by remaining portions of lots 6 and 7, belonging to Blanche E. Moncure, to Ernest U. Boggs and being the same property as that conveyed to the said Curtis L. Wood by deed from Ernest U. Boggs and wife dated August 23, 1924, and recorded in Williamsburg Deed Book #10 pp. 318-19,' the same also, being property described as lot 2 in the deed above, from Blanche E. Moncure to the bankrupt. This deed was admitted to record July 12, 1928.

"On February 14, 1929, Ernest Boggs, was adjudicated bankrupt, upon his voluntary petition filed the same day, and, though he did not schedule, as a part of his estate, either of the lots which had been conveyed to him by Blanche E. Moncure, he had not made a conveyance of lot 1, and the legal title to this lot was still in him, as of the date of bankruptcy.

"On May 24, 1929, and in pursuance of section 21e and 47c of the Bankruptcy Act, 11 USCA §§ 44 (e), 75 (c), the trustee caused to be recorded a certified copy of the order approving his bond, as such, as well as a certified copy of the order of adjudication of bankruptcy.

"On June 10, 1929, and subsequent to the date of the intervening of this bankruptcy, Warburton made a deed to Mrs. Anna L. Bull which purports to convey the property mentioned in the deed from Blanche E. Moncure to the bankrupt as Lot 1, and since receiving this conveyance, Mrs. Bull has erected a dwelling upon Lot 1. The consideration for the conveyance from Warburton to Mrs. Bull was $2500.00 and the dwelling cost Mrs. Bull $6625.00. The deed from Warburton to Mrs. Bull was admitted to record June 13, 1929, and it describes the property it purports to convey as follows:

"'All that certain lot of land situated in the City of Williamsburg, Virginia, at the Southeastern intersection of Prince George and Cromwell Streets, fronting on the eastern line of Cromwell Street the distance of 50 feet, and thence extending back eastwardly between parallel lines the distance of 100 feet, more or less, to the line of Block #5; its northern line being the southern line of Prince George Street, and its southern line being the northern line of the lot of land owned by Geneva Mullen, and being the same lot of land as that purchased by the said John G. Warburton from Curtis L. Wood, but due to an error in the deed from Wood to Warburton, recorded in Williamsburg D. B. 13, p. 20, the lot adjoining the above described lot on the south was described in said deed instead of the one hereby conveyed, and being the same lot of land as that released and quitclaimed unto the said John G. Warburton by deed from Ellsworth Wiltshire, Trustee in Bankruptcy, in the matter of Ernest Boggs, Bankrupt, dated ——— day of June, 1929, and duly recorded in the Clerk's Office of the City of Williamsburg, Virginia.'"

In addition to the facts found by the referee, the following facts are found in a

**614**

stipulation entered into between counsel: "Boggs was adjudicated a bankrupt on the 14th day of February, 1929, and subsequent to such adjudication the Trustee in Bankruptcy filed a report setting forth substantially the above facts and prayed the Court to enter an order declaring the interests of the various parties in and to the aforesaid two lots, and for further order directing the Trustee to release and quitclaim to John G. Warburton all interest and title in and to the aforesaid Lot No. 1, the contents of which said report were fully known to the said John G. Warburton; that thereafter and before the Hon. D. Lawrence Groner, Judge of the United States District Court for the Eastern District of Virginia, had acted upon the said report the said John G. Warburton made, executed, acknowledged and delivered a deed to Mrs. Anna L. Bull, purporting to convey the aforesaid Lot No. 1 and further executed, acknowledged and delivered a quitclaim deed to Geneva Mullen quitclaiming all of his interest in and to the aforesaid Lot No. 2; that thereafter Mrs. Bull erected upon the said Lot No. 1 a residence of the value of $6625.00; that the Hon. D. Lawrence Groner refused to confirm the report of the Trustee and to order him to execute a quitclaim deed to the said John G. Warburton, in accordance with the prayer of the said report of the said Trustee, and thereafter entered an order referring the whole controversy with respect to the aforesaid lots to a Master for investigation and report as to the rights of the several parties in the land in question."

In the deed of June 10, 1929, from Warburton to appellee Bull, the reference to a deed from the trustee, appellant Wiltshire, was evidently inserted in the expectation that the judge would authorize the reformation by the trustee, but no such deed was ever made. Judge D. Lawrence Groner, who was at that time judge of the District Court, refused to allow the trustee to make the deed, and instructed the referee in bankruptcy to report on the matter. This the referee did, holding in his report that, as under the Bankruptcy Act (section 47a, 11 USCA § 75(a), the status of the trustee was that of a judgment creditor with his judgment recorded, his lien attached to the property, and was prior to Mrs. Bull's equity of reformation.

The learned judge below heard the matter on exceptions, on behalf of appellees, to the referee's report as special master, sustained the exceptions, and held that the "entire equitable title and beneficial interest" in the property was in Mrs. Anna L. Bull, and ordered the trustee to convey said property to her. From this action this appeal was brought.

■ It is admitted on behalf of appellants that the general rule is that a judgment creditor can acquire no greater rights in the property of a debtor than the debtor himself had, where there are no statutory provisions to interfere.

"Judgment Creditor. It is settled law that judgment creditors are in no sense purchasers, being simply general lien-holders upon whatever interest the judgment party may have in the land, and hence their rights do not stand in the way of the reformation of prior deeds and mortgages. But a defectively executed mortgage was not permitted to be reformed so as to defeat a subsequent judgment lien." 34 Cyc. 954. See, also, note in 44 A. L. R. 117.

This seems to have been the uniform holding in Virginia.

"It has been over and over again decided that the judgment creditor can acquire no better right to the estate than the debtor himself has when the judgment is recovered. He takes it subject to every liability under which the debtor held it, and subject to all the equities which exist at the time in favor of third persons; and a court of chancery will limit the lien of the judgment to the actual interest which the debtor has in the estate. The creditor is in no sense a purchaser; he has no equity whatsoever beyond what justly belongs to his debtor; his claim is to subject to his lien such estate as the former owns, and no more." Floyd v. Harding, 28 Grat. (Va.) 401.

See, also, Borst v. Nalle, 28 Grat. (Va.) 423; Coldiron v. Asheville Shoe Co., 93 Va. 364, 25 S. E. 238; Charlottesville Hardware Co. v. Perkins, 118 Va. 34, 86 S. E. 869; McClanahan's Adm'r v. N. & W. Ry. Co., 122 Va. 705, 96 S. E. 453; Van Nostrand v. Zinc Corp., 126 Va. 131, 101 S. E. 65.

It is, however, contended that the Virginia Recording Statute does interfere, and that the decision of the Supreme Court of Appeals of that state in Blair v. Rorer's Adm'r, 135 Va. 1, 116 S. E. 767, so held.

■ In view of the fact that on this question the holding of the Virginia court would constitute a "rule of property" binding on the court, we have carefully examined the Virginia decisions and reached the conclusion that the opinion in Blair v. Rorer's Adm'r,

supra, does **not** sustain appellant's contention.

In an able opinion, the judge below says:

"Counsel for the Trustee in Bankruptcy strongly rely upon the provisions of the recording acts of Virginia as conclusive of this case. One of the most important purposes, if not the most important, of the recording acts is to prevent fraud upon innocent subsequent purchasers and upon creditors who may and frequently do act upon the false credit which the debtor is able to obtain by reason of the appearance of ownership of property. Here, no such situation exists. No creditor could possibly be heard to say that he was mislead into extending credit by assuming that Boggs, the bankrupt, owned the residence on lot No. 1, since the residence was constructed some time after Boggs had been adjudicated a bankrupt. This is equally true as to Boggs' apparent ownership of lot No. 1. If his creditors may be said to have relied on the record as showing that Boggs owned lot No. 1 and to have extended credit upon that showing, then it may be said with equal or greater force that the record tended greatly to diminish rather than to increase Boggs' appearance of wealth since the same record which showed him to be possessed of lot No. 1 only, (whereas in fact he was possessed of lot No. 2 with a residence erected thereon by him) due to the same mistake, showed Boggs' grantee, and not Boggs, to be possessed of lot No. 2 with the residence thereon, thus diminishing rather than increasing the apparent extent of Boggs' estate.

"Blair v. Rorer's Adm'r, 135 Va. 1 [116 S. E. 767], is relied upon by counsel for the Trustee as conclusive authority for their contention. The Court feels that the principle enunciated by the Supreme Court of Appeals of Virginia in numerous other cases is more applicable to the instant case than in Blair v. Rorer. See Coldiron v. Asheville Shoe Company, 93 Va. 364 [25 S. E. 238]; McClanahan v. N. & W. Ry. Co., 122 Va. 705 [96 S. E. 453]; and Van Nostrand v. Zinc Corp., 126 Va. 131 [101 S. E. 65].

"The Court is unable to find anything in Blair v. Rorer which overrules or really weakens the force of those decisions. Certainly when applied to a case like we have here the principle enunciated in those decisions makes a very strong appeal to the sense of justice.

"It is also worthy of notice that in Blair v. Rorer the judgment creditors whose liens were then under consideration were not parties to the suit for reformation which was the basis of a defense to the enforcement of the liens of their judgments. It necessarily followed that they were not bound by the reformation proceedings, which was expressly held by the Supreme Court of Appeals of Virginia, 135 Va. 43 [116 S. E. 767]. Hines v. Robinson, 57 Me. 324, 330, 99 Am. Dec. 772, 773, is one of the two authorities cited and quoted by the Supreme Court of Appeals as controlling authority in Blair v. Rorer. In the quotation from that case there appears the following language (135 Va. 44-45 [116 S. E. 767]):

"'A deed, which, through the ignorance or heedlessness of the scrivener, misrepresents the bargain between the parties, may doubtless be reformed in equity, but until that is done it must be allowed to have in a suit at law all its legitimate effect according to its terms.'"

"Here one of the very objects of the proceedings now before the Court is to determine whether or not this is a proper case for the Court, sitting as a court of equity, to reform the deeds in question so as to make them show the true agreement between the parties, so that Hines v. Robinson rather sustains the Court's conclusion in this case."

In our opinion, the case of Blair v. Rorer's Adm'r, supra, is distinguishable from the case of McClanahan v. N. & W. Ry. Co., supra, in both of which cases Judge Burks wrote the opinion, and is also distinguishable from the case here. In the Blair Case, the creditors were not parties to the action in which reformation was decreed, and were not bound by any action taken. Here the trustee claiming under his status as a judgment creditor is not only a party that would be bound but had himself petitioned the court to be authorized to make a deed carrying out the reformation. Again in the Rorer Case the property rights were asserted by one in possession of land and asserting title thereto by deed which was required by statute to be recorded in order to defeat the rights of a judgment creditor. Here, as in the McClanahan Case, as well as in the other Virginia cases above cited, the property right asserted, is an equitable right (the equity of reformation), not capable of recordation, and not required to be recorded under the statute.

Surely, had Judge Burks, in the Blair Case, intended to overrule or modify the rule as laid down by him in the McClanahan

Case he would have expressly said so. Apparently, to his mind, as to ours, the two opinions were not in conflict.

 The claim of appellee Anna L. Bull is certainly just and equitable. The record discloses that the conveyance was made to her after the trustee had petitioned the court to order the reformation by deed, and it seems clear that all connected with the case expected the reformation deed to be made. As shown by the judge in his opinion, no creditor could possibly have given the bankrupt credit on the strength of the erroneous conveyance. Mrs. Bull erected a valuable house on the lot in question after the conveyance to her of the lot originally intended to be conveyed. The trustee must of necessity have known of the conveyance and the erection of the house. No creditor would be allowed to profit by such a situation, and it would be highly inequitable and unjust to permit the trustee to do so for their benefit. It is not necessary to quote authority to the effect that bankruptcy courts are controlled by equitable principles. In Zartman v. First National Bank, 216 U. S. 134, 30 S. Ct. 368, 369, 54 L. Ed. 418, the court said: "The position of the trustee in bankruptcy seems to be that the mistake made by Bacon in dictating or writing out the contract between himself and the Waterloo bank 'is an asset in his hands, as part of the estate of the bankrupt'; but we cannot agree to that. The trustee claims that he takes the same kind of title as a bona fide purchaser for value; but the rule applicable to this and all similar cases is that the trustee takes the property of the bankrupt, not as an innocent purchaser, but as the debtor had it at the time of the petition, subject to all valid claims, liens, and equities. Thompson v. Fairbanks, 196 U. S. 516, 49 L. Ed. 577, 25 S. Ct. 306, and cases cited."

It is also contended on behalf of appellant that as against a trustee in bankruptcy parol testimony cannot be introduced to show the mistake in a deed. On this point we agree with the judge below, who said in his opinion: "There are many decisions of the highest Courts of Virginia and West Virginia which so hold. See 7 Digest of Va. and W. Va. Reports, page 354, title 'The proof may also be by parol evidence.' See, also, Ackerlind v. United States, 240 U. S. 531, at page 534 [36 S. Ct. 438, 60 L. Ed. 783], in which it is expressly held by the Supreme Court of the United States that in a proper case reformation of a contract may be had even against the United States itself. Reference is also made to 23 R. C. L., § 66, page 366, where it is said:

" 'It is practically a universal rule that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is always admissible to establish the fact of fraud or of a mistake and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had. This doctrine impinges on and limits the salutary rule of law against the admission of parol evidence to vary a written contract, but experience has clearly shown this to be necessary; otherwise a rule adopted by the courts as a protection against fraud and false swearing would, as was said in regard to the analogous rule known as the statute of frauds, become the instrument of the very fraud it was intended to prevent.'

. " 'Evidence of fraud or mistake is seldom found in the instrument itself, from which it follows that unless parol evidence may be admitted for that purpose, the aggrieved party would have as little hope of redress in a court of equity as in a court of law. Generally, it may be said that any testimony which tends to prove the mistake alleged or the intention of the parties is admissible. In an action to reform a written contract for fraud or mistake, and to enforce the same when reformed, or, if it cannot be reformed, then to rescind the written contract, the original writing, made by the same parties on the subject matter in dispute, may be given in evidence and also the subsequent acts done, or procured to be done, by the party charged with the fraud and which tend to prove the fraud or mistake. To correct an error in a policy of insurance, the original memorandum of application for insurance and its indorsements showing its acceptance by the company are admissible. The policy itself is admissible to prove mistake and intention of the parties. If the hearing is of the character of the hearing in an equity case, or, in other words, if the issue as to whether the instrument in question can be reformed is not submitted to a jury, the admission of evidence which is not strictly competent according to the common law is not necessarily ground for reversing the judgment or decree if other evidence properly admitted in the case sufficiently sustains the findings."

The right of reformation clearly existed. Under the Virginia decisions the recording

statute does not interfere with this right. The order of the lower court is accordingly affirmed.